IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

NATIONAL FOOTBALL LEAGUE PLAYERS
ASSOCIATION, on its own behalf and on behalf
of TOM BRADY,

                        Petitioner,

          -v.-

NATIONAL FOOTBALL LEAGUE and
NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL,

                     Respondents.

Case No. 15 C v 3168 RHK/HB

**UNREDACTED PETITION
TO VACATE ARBITRATION
AWARD**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**RECEIVED**

JUL 2 9 2015

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

Petitioner National Football League Players Association ("NFLPA" or "Union"), on its own behalf and on behalf of Tom Brady, hereby petitions this Court, pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), and Section 10 of the Federal Arbitration Act, 9 U.S.C § 10 ("FAA"), to vacate the July 28, 2015 Arbitration Award ("Award") (NFLPA Ex. 210 hereto[1]) issued by National Football League ("NFL" or "League") Commissioner Roger Goodell.

## INTRODUCTION

1.      Goodell's Award denied the Union and Brady's arbitration appeal of an unprecedented four-game suspension for Brady's purported "general awareness" that two New England Patriots equipment personnel allegedly deflated Patriots footballs prior to the 2015 AFC Championship Game.

2.      Through this Petition, the NFLPA and Brady seek to set aside the Award, which defies the binding ruling of this Court in *Peterson*, ignores the "law of the shop" and the essence of the parties' collective bargaining agreement ("CBA"), and gives the

---

[1]      Exhibit citations herein refer to the exhibits submitted with this Petition. Petition exhibit numbers 1-203 coincide with the numbers of the exhibits submitted by the NFLPA and Brady through the June 23, 2015 arbitration hearing in the underlying Article 46 arbitration proceeding before Commissioner Goodell which resulted in the issuance of the Award. Exhibit numbers 205-208 are the NFLPA and Brady's post-hearing brief and attendant exhibits, also submitted to Goodell. Exhibit number 204 is the full transcript from the June 23 arbitration before Commissioner Goodell.

Petitioners have also filed contemporaneously with the Court an *ex parte* motion to file certain of those exhibits, as well as selected portions of this Petition, under seal because the NFL insisted upon a confidentiality agreement.

back of the hand to fundamental arbitral principles concerning procedural fairness and arbitrator bias.

3.      In *Peterson*, this Court squarely held that the law of the shop under the CBA affords players advance notice of potential discipline.  This Court further held in *Peterson* that any arbitration award sustaining discipline in the absence of proper notice is an award contrary to the essence of the CBA and must be vacated.

4.      Thumbing its nose at the *Peterson* order, Commissioner Goodell's Award upholds Brady's four-game suspension in its entirety despite the undisputed arbitration record of several egregious notice defects:  Brady had no notice of the disciplinary standards that would be applied to him; no notice of the disciplinary policies that would be applied; and no notice of the potential penalties.  In fact, the NFL collectively bargained over the punishments (*fines*, not suspensions) for alleged equipment tampering by players—including those designed to gain a competitive advantage—and was not free to disregard that CBA bargain and subject Brady to other standards, policies, and penalties without any notice at all.

5.      The notice defects which each independently require vacating the Award are:  (i) suspending Brady for claimed "general awareness" of alleged misconduct by other people, an unknown disciplinary standard never previously applied to players in the history of the NFL; (ii) suspending Brady despite the fact that the Player Policies provide only for specified *fines* for any type of equipment violation; (iii) subjecting Brady to the Competitive Integrity Policy, which applies only to Clubs—*not* players; and (iv) suspending Brady for alleged non-cooperation, when a fine is the only penalty that has

ever been upheld in such circumstances. By ignoring each one of these notice failures, the Award—as in *Peterson*—utterly disregards the CBA law of the shop and must be vacated for defying the essence of the CBA.

6. But the Award's legal defects do not stop there. The Award ignores the law of the shop requirement of fair and consistent treatment by basing discipline on ball pressure "testing" that the NFL concedes did not generate reliable information because of its failure to implement any protocols for collecting such information. Additionally, the Award is the product of a fundamentally unfair process, and was issued by an evidently partial arbitrator who put himself in the position of ruling on the legality of his own improper delegation of authority in violation of the CBA. Each of these grounds independently requires vacating the Award.

## SUMMARY OF ARBITRATION PROCEEDINGS

7. Tom Brady quarterbacks the New England Patriots and is one of the most successful players—on and off the field—in NFL history. This past February, he led the Patriots to their fourth Super Bowl championship during his tenure with the team, tying him for the most all-time Super Bowl victories by a quarterback.

8. Following the 2015 AFC Championship Game, the NFL launched an investigation into whether the Patriots footballs were improperly deflated below the pressure range ("PSI") permitted by NFL rules. Goodell commissioned one of the League's regular outside law firms, Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), led by partner Theodore Wells, to co-lead the "Deflate-gate" investigation along with NFL Executive Vice President and General Counsel Jeffrey Pash (the "Wells-Pash

Investigation"). NFLPA Ex. 7, Wells Report at 1. The League and Paul Weiss have publicly touted the Wells-Pash Investigation as "independent."

9.     The investigation was conducted, and punishments imposed, under the NFL's Policy on Integrity of the Game & Enforcement of Competitive Rules ("Competitive Integrity Policy"). *Id.* However, by its own terms, the Competitive Integrity Policy applies to Clubs—*not* players. Accordingly, the Competitive Integrity Policy was never given to players, and it is undisputed that Brady never saw the Policy prior to these proceedings. NFLPA Ex. 210, Award at 17 n.19.

10.    On May 6, many months and many millions of dollars in legal fees later, Paul, Weiss and the NFL issued the "Wells Report" summarizing the findings from their investigation. The purportedly independent Wells Report was edited by Pash, the NFL's General Counsel, before its public release. The Report concluded that it was "more probable than not" that two Patriots equipment employees—John Jastremski and Jim McNally—had violated the Competitive Integrity Policy by "participat[ing] in a deliberate effort to release air from Patriots game balls after the balls were examined by the referee" prior to the start of the AFC Championship Game. NFLPA Ex. 7, Wells Report at 2. The Wells Report reached this conclusion notwithstanding the denials of Jastremski and McNally and the absence of any other witness or document directly supporting the claims of ball deflation. Moreover, even though footballs are expected to naturally deflate when moving from a warm locker room to a cold-weather environment (like the AFC Championship Game), the Wells Report concluded that human intervention was "more probable than not" based on a statistical and scientific analysis. At the same

time, however, the Wells Report conceded that this analysis rested on numerous "assumptions"—because of the League's failure to record the necessary data—and that "varying the applicable assumptions can have a material impact upon the ultimate conclusions." *Id.* at 13.

11.     With respect to Brady's alleged role, the Wells Report findings were even more limited.  The Report concluded it was "more probable than not that Brady was at least *generally aware*" of the alleged misconduct by McNally and Jastremski.  *Id.* at 17 (emphasis added).  The Wells Report did *not* find that Brady actually knew about any ball deflation at the AFC Championship Game; it did not find that Brady directed or authorized any ball deflation; nor did it find that Brady even had any knowledge of the Competitive Integrity Policy pursuant to which he was punished and the Wells-Pash Investigation was conducted.

12.     After the Wells Report was released, the Union and Brady waited to see what, if any, action Commissioner Goodell would take.   As the Commissioner, Goodell—and no one else—has the exclusive authority under the CBA to take certain disciplinary actions against players for conduct detrimental to the League.  But, in this case, Goodell improperly abdicated his CBA role and delegated his disciplinary authority to NFL Executive Vice President Troy Vincent.

13.     Vincent, invoking the Competitive Integrity Policy (as opposed to the applicable League Policies for Players ("Player Policies")), and resting solely on the limited factual conclusions from the Wells Report about Brady's alleged "general awareness," suspended Brady for four games.  NFLPA Ex. 10.  Vincent also based this

punishment on Brady's purported failure to cooperate with the Wells-Pash Investigation. *Id.* The full extent of the alleged "non-cooperation" found by Wells and cited by Vincent was Brady declining, on the advice of his agents who were also acting as his attorneys, to respond to Wells' requests to produce certain of his private text messages and e-mails. *Id.* The applicable Player Policies on equipment violations were not even considered in Vincent's discipline letter.

14.     On May 14, 2015, Brady timely appealed his suspension pursuant to Article 46 of the CBA.  Goodell decided to serve as the arbitrator.  Brady and the NFLPA moved for his recusal because, among other things, Goodell had directed the unlawful delegation of his CBA disciplinary authority to Vincent.  Thus, as arbitrator, Goodell would have to determine the facts and CBA legality of his own conduct.  Moreover, Goodell was an essential witness on the delegation issue and obviously could not serve as both arbitrator and a fact witness in the same proceeding.  NFLPA Ex. 11.  The Commissioner nonetheless rejected the recusal request.  NFLPA Exs. 157, 160.

15.     On June 23, 2015, Goodell held the arbitration.  *See* NFLPA Ex. 204.  The hearing defied any concept of fundamental fairness.  Prior to the hearing, Goodell had ruled that Brady and the Union could not question essential witnesses, denied them access to the investigative files underlying the Wells Report (which were nonetheless available to the NFL's counsel at the arbitration), and summarily rejected Brady's unlawful delegation argument without considering any evidence (other than "facts" decreed by Goodell himself in his decision).  At the hearing itself, Paul, Weiss—the purportedly "independent" law firm whose findings about Brady were being

challenged—abandoned all pretense of objectivity, and actively participated as counsel for the NFL conducting direct and cross-examinations of witnesses (including Brady's). A Paul, Weiss partner represented the NFL for most of the hearing, even though he was a signatory to the Wells Report and his law partner (Wells) was a fact witness at the same hearing.

16.    In addition, the arbitration established that the NFL had no procedures whatsoever for collecting information essential to determining whether the Patriots balls had deflated due to environmental factors or human intervention. In fact, just *three days ago,* the NFL let it be known that, for the first time, it is implementing procedures for ball pressure testing—a stark concession that it had no procedures in place when the data on which Brady's punishment was based was collected. The League's admitted failure to timely implement any such data collection protocols caused the League's scientific and statistical consultants to make a multitude of unsupported assumptions and rendered their analysis utterly unreliable.

17.    And, the hearing confirmed all of the undisputed facts about the lack of proper notice.

18.    On July 28, 2015, Commissioner Goodell issued the Award upholding Brady's suspension. True to form, Goodell's Award is little more than an exercise in rehashing the Wells Report, and making unfounded, provocative and mystifying attacks on Brady's integrity. At the same time, the Award ignores the fundamental legal arguments presented by the Union which form the basis of this Petition and require that the Award be set aside.

19.     For example, the Award disregards the myriad defects in notice—
contending that Brady's knowledge that, in the broadest sense, he could be suspended for
"conduct detrimental" eliminated the need for the League to provide any notice about
whether a general awareness standard of conduct could be applied, which policies could
be applied, and what the potential penalties for violations of the applicable Player
Policies might be.  But this contention has already been rejected by this Court in *NFLPA
v. NFL (Adrian Peterson)*, slip op. at 12-14 (D. Minn. Feb. 26, 2015), *appeal docketed*,
No. 15-1438 (8th Cir. Feb. 27, 2015) (which the Award also ignores), where the domestic
violence conduct at issue constituted conduct detrimental under any policy, but where the
arbitration award was nevertheless vacated because it violated the essence of the CBA
requirement that Peterson have advance notice of the *specific policy* and *penalties* to
which he could be subjected.  NFLPA Ex. 153.

20.     Here, the only arguably applicable policy was contained in the Player
Policies, but the Award deliberately ignores this fact because those Policies expressly
provide for modest fines—not suspensions.  NFLPA Ex. 114 at 20.  The Award also
ignores Vincent's application of a "generally aware" disciplinary standard that was pulled
from whole cloth without notice and applied to a player for the first time in NFL history.

21.     The most the Award has to say about notice is to try to deny, in a footnote,
that either the Competitive Integrity Policy or any other policy was applied.  NFLPA Ex.
210, Award at 17, n.19.  Putting aside that this assertion belies the arbitration record that
Vincent *did* apply the Competitive Integrity Policy to Brady and punished him for being
generally aware that Patriots equipment personnel violated that policy, it does not save

the Award from vacatur. According to the Award, Brady was suspended for general awareness under *no* policy, but there is a *specific* Player Policy concerning equipment violations that does *not* provide for suspensions or "general awareness" violations. This is just the type of notice defect which this Court found in *Peterson*. There, Peterson had notice of one version of the Commissioner's Personal Conduct Policy, only to have the Commissioner apply a different version of the Personal Conduct Policy with different rules and penalties.

22.     The Award also makes much of Brady's purported non-cooperation, (including a brand new, hyperbolic and baseless accusation that Brady "destroyed" his cell phone after being advised by his agents-lawyers not to turn over private communications to the NFL's outside law firm). This issue is a complete red herring because the NFL already had all of the relevant text communications by Brady from other Patriots personnel—a fact established by Brady's telephone records, which were produced at the hearing, and which showed the time and date of every text and phone call to or from Brady and Patriots personnel (or anyone else). NFLPA Exs. 1, 3.

23.     But most importantly for purposes of this Petition, Goodell's decision on the punishment for alleged non-cooperation yet again violates the CBA requirement of notice. As his predecessor, Commissioner Tagliabue, ruled when serving as a CBA arbitrator:

> *There is no evidence of a record of past suspensions based purely on obstructing a League investigation. In my forty years of association with the NFL, I am aware of many instances of denials in disciplinary proceedings that proved to be false, but I cannot recall any suspension for such*

> ***fabrication.   There is no evidence of a record of past
> suspensions  based  purely  on  obstructing  a  League
> investigation.***

NFLPA Ex. 113, *Bounty*, slip op. at 13 (2012) (Tagliabue, Arb.).

24.     The Award further ignores that Wells never once told Brady that discipline

could flow from declining to produce his personal text messages or e-mails.

25.     With respect to the other grounds for vacatur, the Award also turns a blind

eye to the NFL's undisputed failure to implement procedures for testing the footballs at

the AFC Championship Game such that there was no fair and consistent basis for the

NFL to base any punishment on its consultants' conclusions; ignores the procedural

defects depriving Brady of a fundamentally fair hearing; and says nothing about

Goodell's evident partiality.

26.     In a public statement issued earlier today, Patriots Owner Robert Kraft

appropriately summarized the Award:

> The decision handed down by the League yesterday is
> unfathomable to me.  It is routine for discipline in the NFL to
> be reduced upon appeal.
>
> In the vast majority of these cases, there is tangible and hard
> evidence of the infraction for which the discipline is being
> imposed, and still the initial penalty gets reduced.  Six months
> removed from the AFC championship game, the League still
> has no hard evidence of anybody doing anything to tamper
> with the PSI levels of footballs.  I continue to believe and
> unequivocally support Tom Brady....
>
> The League's handling of this entire process has been
> extremely  frustrating  and  disconcerting.  I  will  never
> understand why an initial erroneous report regarding the PSI
> level of footballs was leaked by a source from the NFL a few
> days after the AFC championship game, [and] was never

corrected by those who had the correct information. For four months, that report cast aspersions and shaped public opinion.

Yesterday's decision by Commissioner [Goodell] was released in a similar manner, under an erroneous headline that read, "Tom Brady destroyed his cellphone." This headline was designed to capture headlines across the country and obscure evidence regarding the tampering of air pressure in footballs. It intentionally implied nefarious behavior and minimized the acknowledgement that Tom provided the history of every number he texted during that relevant time frame....

Tom Brady is a person of great integrity, and is a great ambassador of the game, both on and off the field. Yet for reasons that I cannot comprehend, there are those in the League office who are more determined to prove that they were right rather than admit any culpability of their own or take any responsibility for the initiation of a process and ensuing investigation that was flawed. I have come to the conclusion that this was never about doing what was fair and just....

I was wrong to put my faith in the League. Given the facts, evidence, and laws of science that underscore this entire situation, it is completely incomprehensible to me that the League continues to take steps to disparage one of its all-time great players, and a man for whom I have the utmost respect. Personally, this is very sad and disappointing to me.[2]

27. As in *Peterson*, the Court must again intervene and vacate the Award, which (i) violates the law of the shop requirement of notice, (ii) violates the law of the shop requirement of fairness and consistency, (iii) is the product of fundamentally unfair proceedings, and (iv) was issued by an evidently partial arbitrator.

---

[2] *See Florio:* Robert Kraft tees off on Brady ruling, ProFootballTalk.Com (July 29, 2015), http://profootballtalk.nbcsports.com/2015/07/29/robert-kraft-tees-off-on/.

28.     Because the Award was issued on the eve of the 2015 NFL season, it will irreparably harm Brady if he misses games while the Court considers the merits of the Petition. Accordingly, the NFLPA and Brady will shortly file a Motion for Preliminary Injunction or, in the Alternative, for Expedited Disposition so that relief can be granted prior to September 4, 2015, when the Patriots begin final preparations for their first regular season game.

## JURISDICTION AND VENUE

29.     This is an action to vacate the Award pursuant to Section 301 of the LMRA and Section 10 of the FAA. This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331.

30.     The NFL derives revenue from advertising, ticket sales, merchandising, and broadcast revenue throughout the State of Minnesota and is subject to personal jurisdiction here. The Minnesota Vikings, one of 32 NFL franchises, is headquartered in Eden Prairie, Minnesota and does business in this district.

31.     Venue is proper in this court under 28 U.S.C. § 1391 and 29 U.S.C. § 185, as the NFL regularly transacts business in this district.

## PARTIES

32.     Petitioner NFLPA is a non-profit corporation duly organized and existing under the laws of the Commonwealth of Virginia and is the Union and exclusive collective bargaining representative of all present and future NFL players, including Brady. The NFLPA's offices are located at 1133 20th Street, N.W., Washington, D.C. 20036.

33.     Petitioner Tom Brady is a professional football player and member of the NFLPA. He was selected by the New England Patriots in the 2000 NFL Draft and has spent his entire career with that Club. During that time, Brady has won four Super Bowls, been named Super Bowl Most Valuable Player three times, and been awarded the NFL's Most Valuable Player twice. Brady resides in Massachusetts.

34.     Respondent NFL maintains its offices at 345 Park Avenue, New York, New York, 10154, and is an unincorporated association consisting of 32 separately owned and operated professional football franchises, one of which is located in this District. All NFL franchises conduct business by playing professional football games in this District.

35.     Respondent National Football League Management Council ("NFLMC") is the exclusive bargaining representative of all present and future employer member franchises of the NFL.

## RELEVANT NON-PARTIES

36.     Roger Goodell is the Commissioner of the NFL, *i.e.*, the *de facto* chief executive officer. He also served as the arbitrator in this case.

37.     Troy Vincent is the NFL Executive Vice President of Game Operations. He imposed Brady's discipline.

38.     Theodore Wells, Jr. is a partner in the law firm of Paul, Weiss who serves as counsel to the NFL and declared that his firm was acting as "independent" counsel in investigating the Patriots and Brady for alleged improper ball deflation.

39.     Jeffrey Pash is an Executive Vice President and General Counsel of the NFL.  He was identified by the NFL as the co-lead investigator, with Wells, in this matter.

## DETAILED STATEMENT OF ARBITRATION FACTS

### A.     COMMISSIONER DISCIPLINE OF PLAYERS UNDER THE CBA

40.     The parties are bound by the CBA negotiated between the NFLMC, on behalf of the NFL member teams, and the NFLPA, on behalf of all NFL players.  The current CBA was signed on August 4, 2011.

41.     Paragraph 15 of the collectively bargained standard form NFL Player Contract provides the Commissioner with the exclusive authority to impose discipline on NFL players for "conduct detrimental to the League."  NFLPA Ex. 108, CBA App. A, ¶ 15.

42.     No one other than the Commissioner is authorized by the CBA to impose discipline on players for conduct detrimental.  For example, Article 46 provides the "exclusive" procedures for conduct detrimental disciplinary appeals and refers only to "action taken against a player *by the Commissioner* for conduct detrimental to the integrity of, or public confidence in, the game of professional football."  NFLPA Ex. 107, CBA Art. 46, § 1(a) (emphasis added).

43.     Moreover, whereas Article 46 expressly provides for the Commissioner to delegate his authority to serve as Hearing Officer in player *appeals*, it provides for no such delegation of his exclusive disciplinary authority in the first instance.  *Id.* § 2(a).

44.   Although the NFLPA agreed that the Commissioner or his designee could serve as the arbitrator for ordinary Article 46 disciplinary appeals, the NFLPA did not agree that the Commissioner could do so under circumstances where, as here, the Commissioner's own conduct is at issue.

45.   Accordingly, in two recent prior arbitrations in which the Commissioner's own conduct and statements were at issue—*Bounty* and *Ray Rice*—even Commissioner Goodell concluded that he had to recuse himself. *See* NFLPA Exs. 113, 124.

46.   Additionally, in a similar situation involving former NFL Commissioner Paul Tagliabue, a New York court held that he could not lawfully serve as arbitrator over a player dispute—even though the NFLPA had previously agreed to Commissioner arbitration—because the proceeding put at issue Commissioner Tagliabue's own conduct. *See, e.g., Morris v. N.Y. Football Giants*, 575 N.Y.S.2d 1013, 1016-17 (N.Y. Sup. Ct. 1991).

## B.   THE CBA LAW OF THE SHOP AFFORDS PLAYERS ADVANCE NOTICE OF POTENTIAL DISCIPLINE

47.   It is established law of the shop under the CBA that NFL players may not be subject to discipline without advance notice of what conduct might result in such discipline, and what the disciplinary consequences might be. NFLPA Ex. 153, *Peterson*, slip op. at 12-14; *see also* NFLPA Ex. 124, *Rice*, slip op. at 16 (2014) (Jones, Arb.) (holding retroactive punishment prohibited because it is inconsistent with the CBA requirement of notice); NFLPA Ex. 113, *Bounty*, slip op. at 6 (former Commissioner Tagliabue vacating Commissioner Goodell's discipline of four New Orleans Saints

players for, among other things, lack of notice, and holding that "a sharp change in . . . discipline can often be seen as arbitrary and as an impediment rather than an instrument of change"); NFLPA Ex. 91, *Reggie Langhorne*, slip op. at 25 (1994) (Kasher, Arb.) (setting aside fine and suspension because player "was entitled at some time to be placed on notice as to what consequences would flow from his refusal to [abide by the rules]. Any disciplinary program requires that individuals subject to that program understand, with reasonable certainty, what results will occur if they breach established rules."); NFLPA Ex. 101, *Ricky Brown*, slip op. (2010) (Beck, Arb.) (vacating team discipline because player did not receive notice of rule he was accused of violating); NFLPA Ex. 99, *Laveranues Coles*, slip op. (2009) (Townley, Arb.) (same).

48.     The CBA requirement of notice was recently affirmed by former U.S. District Court Judge Barbara Jones in *Rice* and by this Court in *Peterson.* Judge Jones, sitting as Article 46 arbitrator over former Baltimore Ravens running back Ray Rice's disciplinary appeal, held that—notwithstanding Commissioner Goodell's broad discretion under the CBA—he was prohibited from imposing discipline on players in situations where they do not have prior notice:

> Recognizing that even under the broad deference afforded to him through Article 46, he could not retroactively apply the new presumptive penalty to Rice, the Commissioner called Rice to ensure him that his punishment would remain unchanged.   Through this action, Commissioner Goodell acknowledged what the NFL has repeatedly stated in these proceedings: that the Commissioner needed to be fair and consistent in his imposition of discipline.

NFLPA Ex. 124, *Rice*, slip op. at 16.

49.     Furthermore, Goodell testified in *Rice* that he could not retroactively discipline Rice under the NFL's new Personal Conduct Policy because the NFL is "***required to give proper notification***" of player discipline.  NFLPA Ex. 122, *Rice* Tr. 100:13-14 (emphasis added); *see also id.* 101:7-13.

50.     In *Peterson*, the Court vacated arbitrator Harold Henderson's award affirming the retroactive application of the NFL's new Personal Conduct Policy to Adrian Peterson.  The Court held that Henderson had "simply disregarded the law of the shop" requirement of notice.  NFLPA Ex. 153, *Peterson*, slip op. at 12-14.  Although the NFL has appealed this Court's ruling to the Eighth Circuit Court of Appeals, it did not seek a stay of the decision, and thus the order remains in effect and estops the NFL from any attempt to relitigate the CBA requirement of notice.

51.     Most recently, even Arbitrator Henderson ruled in the *Hardy* proceedings that the six-game minimum penalty set forth in the new Personal Conduct Policy could not be applied without advance notice—having apparently been chastened by this Court's decision in *Peterson*.  *Greg Hardy*, slip op. at 12 (2015) (Henderson, Arb.).

## C.     THE CBA LAW OF THE SHOP ALSO REQUIRES "FAIR AND CONSISTENT" DISCIPLINE

52.     A long line of CBA precedents holds that discipline under Article 46 must be "fair and consistent."  NFLPA Ex. 124, *Rice*, slip op. at 8.  "Where the imposition of discipline is not fair or consistent, an abuse of discretion has occurred" and the discipline must be overturned.  *Id.*; *see also id.* at 16 ("the Commissioner needed to be fair and consistent in his imposition of discipline").  No less an authority than Commissioner

Tagliabue has held, serving as arbitrator in *Bounty*, that the role of the Article 46 Hearing Officer is to "review[] the discipline for consistency of treatment, uniformity of standards for parties similarly situated and patent unfairness or selectivity." NFLPA Ex. 113, *Bounty*, slip op. at 4.

53.    Indeed, Goodell acknowledged in his testimony in *Rice* that he is bound by this CBA requirement "to be consistent with consistent circumstances, and so if there are consistent circumstances, I think that's about fairness, and fairness would be you should be as consistent as possible in your discipline." NFLPA Ex. 122, *Rice* Tr. 164:18-165:6; *see also* NFLPA Ex. 124, *Rice*, slip op. at 5-6 (quoting Goodell).

54.    Even Arbitrator Henderson, in *Peterson*, recognized that conduct detrimental discipline must be fair and consistent. NFLPA Ex. 153, *Peterson*, slip op. at 9 (quoting Henderson decision applying the established CBA standard of "fair and consistent" treatment). And the Award itself states Goodell's "belie[f] in the need for consistency in discipline for similarly situated players." NFLPA Ex. 210, Award at 14. This is the undisputed law of the shop.

### D.    THE NFL INVESTIGATES THE PATRIOTS' ALLEGED DEFLATION OF FOOTBALLS IN THE AFC CHAMPIONSHIP GAME

#### 1.    The NFL Implements No Protocols for Collecting Information About Football Deflation Prior to the AFC Championship Game

55.    On the night before the AFC Championship Game, Indianapolis Colts General Manager Ryan Grigson sent an e-mail to NFL operations accusing the Patriots of attempting to gain a competitive advantage by using underinflated footballs. NFLPA Ex.

152; NFLPA Ex. 7, Wells Report at 44-45. The NFL did not take this complaint very seriously and did not inform the Patriots before the game that there was any issue with ball tampering. NFLPA Ex. 7, Wells Report at 46 n.25.

56.     Nor, despite the Colts' complaint, did the NFL implement any procedures for measuring the footballs and collecting other information that would be essential to understanding and assessing a change in football pressure. This was because no one at the NFL knew that natural forces of temperature, timing, and wetness could cause balls to lose pressure after being tested and set by officials before the game.

57.     More specifically, no one at the NFL knew there was something called the Ideal Gas Law explaining that balls would naturally deflate when brought from a warm environment (*i.e.*, the officials' locker room) to a cold environment (*i.e.*, the field). As a result, the NFL did not know how to instruct the referees in terms of what testing to conduct and what data to record other than simply taking PSI readings. Indeed, the NFL had no established procedures at all for testing balls during games, at halftime, or after games.

58.     Although each team's footballs were measured by the game day officials prior to the game, the PSI measurements were not recorded, the gauge used to measure (and set) PSI was not recorded, and none of the environmental factors (such as the temperature in the locker room and on the field) were recorded. NFLPA Ex. 7, Wells Report at 51-52, 116.

59.     During the first half of the game, the Colts examined a ball intercepted from the Patriots and made a further complaint to the NFL. In response, the NFL decided

to ask the referees to measure the air pressure in both teams' game balls at halftime. NFLPA Ex. 7, Wells Report at 63-66.

60.    Because of the absence of any protocols or basic understanding of what factors are relevant to football deflation, the data collection was a disaster.  None of the following was recorded:  the temperature on the field; the temperature in the officials' locker room where the balls were tested; the specific gauge used to conduct the testing (where, as here, multiple gauges were used and each had very different calibrations and yielded different readings); whether the balls were wet or dry (and how wet or dry); the sequence and timing of the halftime measurements (this was the most critical factor, because both teams' balls would warm and gain pressure minute-by-minute after being returned from the cold and wet field to the warm and dry locker room, yet the balls were measured at different times).  The Wells Report even states that the PSI measurements of the eleven Patriots balls and four Colts balls that were measured—the only data that *was* recorded—contain a transcription error.  NFLPA Ex. 7, Wells Report at 69 n.41.

61.    After the game, officials tested the pressure level of four footballs from each team.  Once again, however, none of the critical information necessary to determine the meaning of the PSI readings was recorded.  *Id.* at 72-73.

62.    The data collection was so deeply flawed that even Wells and the NFL's consultants concluded that it was unreliable:

> Our scientific consultants informed us that the data alone did not provide a basis for them to determine with absolute certainty whether there was or was not tampering, as the analysis of such data is ultimately dependent upon assumptions and information that is uncertain.

NFLPA Ex. 7, Wells Report at 12.

63.     Just three days ago, the NFL made it known that it is finally going to implement procedures for testing ball pressure during the upcoming NFL Season—a year too late for Brady.[3]

### 2.    The NFL Misunderstands the Halftime Data and Proceeds to Commission the Wells-Pash Investigation

64.     Unaware of the Ideal Gas Law and the now undisputed fact that science predicts that the Patriots (and Colts) balls would drop in pressure after they were brought from a warm locker room to a cold field, NFL Senior Vice President of Football Operations David Gardi sent a letter to Patriots owner Robert Kraft on January 19, 2015, informing him that the NFL was launching an investigation based on the measurements taken at halftime of the AFC Championship Game indicating that the Patriots balls had lost pressure during the first half of the game.  NFLPA Ex. 136; NFLPA Ex. 7, Wells Report at 100-101.

65.     Not only did this letter fail to acknowledge the fundamental flaw in the NFL's premise that any drop in ball pressure suggested tampering, or the absence of critical data from which to assess any reduction in pressure, the letter got the PSI measurements wrong.  Gardi wrote that one of the Patriots balls had measured at 10.1 PSI

---

[3] *See Pereira: NFL informs officials of new procedures for game balls*, FoxSports.com (July 26, 2015), http://www.foxsports.com/nfl/story/deflategate-new-england-patriots-mike-pereira-changes-to-game-balls-072615?vid=492992067892.

when in fact *none* of the Patriots balls had measured at such a low pressure. NFLPA Ex. 136 at 2; NFLPA Ex. 7, Wells Report at 100-101.

66.    On January 23, 2015, the NFL announced that it had retained Wells and his firm, Paul, Weiss, to co-lead the investigation along with Pash. NFLPA Ex. 181; NFLPA Ex. 7, Wells Report at 1.  In recent years, Paul, Weiss has represented the NFL in a number of important legal matters.  For example, the NFL paid Paul, Weiss more than $7 million to defend the League in a recently settled class action related to concussion liability.[4]  NFLPA Ex. 184, *Judge Approves Deal in N.F.L. Concussion Suit* at 4.  With respect to the Wells-Pash Investigation alone, Paul, Weiss had already billed the NFL millions of dollars at the time of the hearing for its services in conducting the investigation.

67.    Despite its close ties to the Paul, Weiss firm, the NFL touted the purported "independence" of the law firm in conducting the investigation:  "Wells and his firm bring additional expertise and *a valuable independent perspective.*"  NFLPA Ex. 181 (emphasis added).  Wells publicly declared Paul, Weiss to be "independent" of the NFL. NFLPA Ex. 189 at 1, 3.

68.    Despite the NFL declaring Paul, Weiss's "independence," the Award confirms the NFL and Paul, Weiss considered themselves to have an attorney-client relationship for purposes of the investigation.  Award at 19 n.20 (NFL asserted attorney-client privilege over its communications with Paul, Weiss).  Adding to the circus-like

---

[4] *In re Nat'l Football League Players' Concussion Injury Litig.*, 12-md-02323 (E.D. Pa.).

atmosphere of the proceedings, Wells' partner Lorin Reisner (who signed the Wells Report's cover page) sat at counsel table for the NFL at the arbitration, conducted the vast majority of witness examinations (including Brady's), and otherwise defended Brady's discipline even though his personal work on the Wells Report was being reviewed, and even though his law partner Wells testified at the hearing. *See generally* Hr'g Tr. And, as the Award acknowledges, Wells asserted attorney-client privilege over his communications with the NFL in connection with the Wells-Pash Investigation. NFLPA Ex. 210, Award at 19 n.21.

69.     Wells further testified that Pash even had an opportunity to comment on a draft of the Wells Report before it was issued. Hr'g Tr. 268:17-25 (Wells); NFLPA Ex. 210, Award at 19 n.21.

70.     As part of the Wells-Pash Investigation, Wells, Reisner, and the Paul, Weiss team interviewed a number of individuals from the League, the Colts, and the Patriots, including Brady. NFLPA Ex. 7, Wells Report at 24-27. It is undisputed that Brady was interviewed for seven hours and was totally cooperative, answering every question that Paul, Weiss put to him.

71.     The only Paul, Weiss request that Brady declined was to look for and produce certain private text messages and e-mails. As Brady testified, he declined Paul, Weiss' request for his electronic information solely on the advice of his agents-lawyers. Hr'g Tr. 84:18-85:9. But it is undisputed that Wells never informed Brady that there could be *any* disciplinary consequences if he did not comply with the request for e-mails and texts.

72.    Moreover, Brady testified that if anyone had told him he could be suspended for declining to produce the private communications, he would have produced them—notwithstanding the advice of his agents-lawyers. *Id.* 86:8-20 (Brady).

73.    Prior to the appeal hearing, Brady voluntarily produced all of the requested communications in his possession (*see infra* ¶ 86). The NFL does not dispute that these communications contain absolutely no incriminating information.   Instead, the NFL complains that they do not include all of the requested text messages because Brady disposed of his phone (consistent with his practice over many years), but Brady produced all of his phone records (showing *whom* he texted with and *when*) and testified at the hearing—just as he had told Wells and Reisner months before at his interview—that there never were any incriminating e-mails or text messages for the simple reason that he had nothing to do with any ball deflation. Hr'g Tr. 85:13-86:1, 86:21-23, 89:24-90:9. While the Award makes much of the discarded phone, Brady's phone records confirm that the League had access to any text messages between Brady and Jastremski and Schoenfeld because the League had access to *their* phones, and Brady simply had no phone or electronic communications of any kind with McNally. NFLPA Ex. 1.

### 3.    The Wells Report Concludes That There Is No Direct Evidence Implicating Brady but Nonetheless Finds That He Was "Generally Aware" of Misconduct by Others

74.    On May 6, 2015, Paul, Weiss and the NFL released the Wells Report (after receiving comments on a draft from Pash, the NFL's General Counsel and publicly proclaimed co-lead investigator).  The Report concluded that it was "more probable than not" that Patriots employees Jastremski and McNally tampered with footballs in violation

of the Competitive Integrity Policy. NFLPA Ex. 7, Wells Report at 2. It reached this conclusion despite finding no direct evidence of misconduct, and despite the flaws in data collection that rendered the statistical and scientific analysis admittedly "uncertain." *Id.* at 12, 17.

75.     The Wells Report also concluded that although its four-month investigation had not yielded any "direct evidence linking Brady" to this alleged ball tampering, it was nonetheless "more probable than not that Brady was at least generally aware" of the alleged misconduct of others violating the Competitive Integrity Policy. *Id.* at 17. Even this very narrow factual conclusion regarding Brady was entirely inferential. It is undisputed that everyone interviewed—including Brady—denied any ball tampering or knowledge of ball tampering.

76.     To reach the conclusion that Brady was "generally aware" of alleged ball tampering by Jastremski and McNally, Wells drew an adverse inference—subsequently sustained by the Award—from the fact that Brady would not respond to the request for his texts and e-mails. But Wells never warned Brady that an adverse inference or any other penalty could result from a refusal to produce personal communications on the advice of counsel.

77.     After the Wells Report was released, Commissioner Goodell publicly praised its findings and work. NFLPA Ex. 157 at 7. By doing so, he made it impossible to serve as arbitrator in any proceeding challenging the conclusions of the Wells Report. And, unsurprisingly, his eventual Award declared the Wells Report unassailable in every respect.

### 4.   Goodell Improperly Delegates His Exclusive Conduct Detrimental Disciplinary Authority to Vincent

78.   Commissioner Goodell announced to the world that he had decided to delegate to Vincent the job of determining the discipline for Brady. NFLPA Ex. 185 at 4. He did so without citing any authority under the CBA for such a delegation.

79.   On May 11, 2015, Vincent imposed a four-game suspension on Brady. NFLPA Ex. 10.  He did so based solely on the Wells Report finding that Brady was "generally aware" of the alleged ball deflation. *Id.* at 1.  The letter confirms that Vincent and the NFL conducted no factual review of their own.

80.   Vincent also advised Brady that his discipline was being imposed in part for his alleged "failure to cooperate" with the Wells-Pash Investigation. *Id.*

### 5.   Brady Appeals His Suspension and Moves for Goodell's Recusal

81.   On May 14, 2015, Brady and the NFLPA appealed the unprecedented suspension levied by Vincent. NFLPA Ex. 11.  In filing the appeal, the NFLPA and Brady objected to Goodell or his designees serving as arbitrator, explaining "that neither Commissioner Goodell nor anyone with close ties to the NFL c[ould] serve as arbitrator in Brady's appeal under governing legal standards" because, among other things, the improper delegation conduct of Goodell himself was going to be at issue, and testimony from Goodell and Vincent would be required to adjudicate this critical point. *Id.* at 2-3.

82.   After receiving no response from the League to their request for appointment of a neutral arbitrator, and after media reports indicated that Goodell

intended to serve as the Hearing Officer, the NFLPA and Brady formally moved for Goodell's recusal. NFLPA Ex. 157.

83.    On June 2, 2015, Goodell denied the recusal motion. NFLPA Ex. 160. Moreover, he peremptorily declared in that same ruling that he was rejecting Brady's improper delegation argument based on the Commissioner's own recitation of the facts and his conclusion that his own conduct was permitted by the CBA. *Id.* All of this happened without any discovery or even a hearing.

84.    Goodell never gave the NFLPA or Brady any opportunity to challenge the purported "fact" that he "did not delegate [his] disciplinary authority to Mr. Vincent" and that, allegedly, Goodell merely "concurred in [Vincent's] recommendation and authorized [Vincent] to communicate to Mr. Brady the discipline imposed under [Goodell's] authority as Commissioner." *Id.* Nor did Goodell hear Brady or the Union on any other aspect of this issue. He just rejected the argument out of hand without any evidence.

### 6.    The Arbitration Before Commissioner Goodell

85.    On June 23, 2015, Commissioner Goodell presided over Brady's arbitration hearing. *See* NFLPA Ex. 204 (transcript of proceedings). Prior to the hearing, Goodell stated that he "look[ed] forward to hearing directly from Tom. If there [was] new information or there [was] information in helping [the NFL] get this right, [he] want[ed] to hear directly from Tom on that." NFLPA Ex. 191 at 3418; NFLPA Ex. 160 at 3. Brady complied, not only by testifying for hours (Hr'g Tr. 47:11-148:7), but also by

producing new evidence demonstrating that each purported basis for his discipline was without any basis.

86.    For example, Brady refuted the Wells Report's conclusion that it was "more probable than not that Brady was at least generally aware" of the alleged misconduct. Brady testified—under oath—that he knew nothing about anyone deflating footballs in the AFC Championship Game or any other game he played in. Hr'g Tr. 50:21-51:16, 75:4-25, 95:12-97:11.    Further, he went through all of the text communications cited with reference to him in the Wells Report in order to demonstrate that not a single one indicated he had knowledge of ball tampering. *Id.* 61:18-63:16, 91:10-96:7, 140:9-141:19.

87.    In addition, the hearing confirmed that only three witnesses interviewed by League investigators could address whether Brady was "generally aware" of ball tampering (McNally, Jastremski, and Brady), and that each of these individuals categorically denied Brady's knowledge of any tampering.

88.    Brady also showed that the Wells Report had improperly concluded that Brady's involvement, in 2006, in efforts to change a League rule to allow a visiting team to prepare its own footballs evidenced his knowledge or concern about the pressure level of game balls. NFLPA Ex. 7, Wells Report at 129. Brady produced a copy of the rule-change petition itself, as well as the Competition Committee report on the change, which has nothing to do with PSI levels. *See* NFLPA Ex. 203.

89.    Brady further demonstrated that he had not been withholding any incriminating evidence. Brady produced all of the responsive e-mails within his

possession, along with his phone records, showing all of his phone calls and text messages during the relevant time period. NFLPA Exs. 1-3. Not one email was relevant to, much less evidence of, deflation. Moreover, consistent with what Brady had told NFL investigators and testified at the arbitration, Brady's phone records demonstrated that he had never had a single phone call or text message with McNally. *See* Hr'g Tr. 81:21-82:7, 139:19-140:8 (Brady) (explaining that he did not know or communicate with McNally); *see also* NFLPA Ex. 1 (reflecting no phone communication with McNally). Further, the phone records demonstrated that virtually all of Brady's communications with Jastremski during the relevant time period were already cited by Wells in his Report, because Wells had taken possession of Jastremski's phone. *See* NFLPA Ex. 7, Wells Report at 30 n.5.

90.    At the hearing, Brady explained that it was impossible to produce his past text messages because of his regular and long-standing practice of recycling phones in order to protect his family's and friends' privacy. Hr'g Tr. 87:7-88:6, 90:11-91:9. This is what Goodell cynically refers to in the Award as Brady "destroying" his phones (an accusation that was not a basis for the discipline imposed by Vincent). In any event, the hearing established—through Brady's phone records, testimony, and the absence of any NFL evidence to the contrary—that virtually all of the communications between Brady and Jastremski are discussed in the Wells Report, confirming that Paul, Weiss already had those text messages from other sources. NFLPA Ex. 3. For the few communications with Jastremski reflected on Brady's phone records but not referenced in the Wells Report, that is presumably because those communications are irrelevant, and Brady

testified that such communications had nothing to do with the alleged ball tampering, and

no incriminating documents were withheld. Hr'g Tr. 85:13-86:1, 140:9-141:19.  Indeed,

the Wells Report confirms that the NFL had full access to the phones from Jastremski

and Schoenfeld so that any text messages from Brady would have been available to the

NFL from those sources.  NFLPA Ex. 7, Wells Report at 30 n.5.  As for McNally,

Brady's phone records confirm they had no text or email or other phone communications.

The shrill emphasis placed by Goodell on Brady discarding an old phone is an attempt to

obfuscate and divert attention from the glaring flaws in the Award and arbitration

process.  It is much ado about a red herring and had no adverse impact on the Wells-Pash

Investigation whatsoever.

91.    In addition, Brady presented the declaration of Patriots owner Robert Kraft,

attesting to Brady's credibility in denying any awareness of ball tampering.

92.    The hearing was also filled with numerous admissions about the NFL's

lack of procedures to record the necessary information to determine whether the drop in

pressure measured in Patriots balls by halftime was caused by environmental factors or

tampering.  Exponent, the League's expert consultants who analyzed the results of the

halftime testing, admitted to this lack of essential information in its own report.  Ex. 8,

Exponent Report at 2.

93.    The NFLPA and Brady also presented the testimony of Dr. Edward A.

Snyder, Dean of the Yale School of Management, an expert on statistics, who had led a

team of experts affiliated with the Analysis Group in reviewing Exponent's work and

studying the testing data from the AFC Championship Game.  As Dean Snyder and the

Analysis Group demonstrated, the failure of the NFL to collect the proper data made it impossible for anyone to draw reliable conclusions based on the recorded PSI measurements. In fact, substituting even a few of the NFL's legions of assumptions with plausible alternatives turned the Wells Report's and Exponent's conclusions on their head. *Id.* 158:11-159:17, 179:15-23, 183:16-23, 194:1-13 (Snyder). Dean Snyder thus established that there was no basis for the NFL to reliably—or fairly—conclude that the Patriots balls were tampered with, let alone that Brady was "generally aware" of such tampering.

94.     Finally, *all* witnesses at the hearing agreed that the Competitive Integrity Policy does not apply to players, that there was no notice of (or precedent for) a disciplinary standard of "general awareness" under *any* NFL policy, that no player in the history of the NFL had ever been disciplined for ball tampering, and that no player in the history of the NFL had ever served a suspension for an alleged lack of cooperation with a League investigation.

## E.    THE COMMISSIONER ISSUES THE AWARD AFFIRMING BRADY'S SUSPENSION

95.     On July 28, 2015, Commissioner Goodell issued the Award upholding Brady's discipline in its entirety. The Award is self-effectuating.

96.     Despite this fact, the NFL engaged in attempted preemptive forum shopping by filing—virtually simultaneously with the issuance of the Award (the timing of which was unknown to the Union and Brady)—a proceeding to confirm the award in the Southern District of New York. The League knew that the central notice issues the

Union had raised in the arbitration were directly related to the *Peterson* proceedings pending before this Court and yet deliberately sought to avoid review by this Court.

97.     The next day, the NFLPA and Brady filed this Petition and will shortly hereafter file a Motion for Preliminary Injunction, or in the Alternative, for Expedited Disposition, seeking to have Brady's suspension enjoined prior to September 4, 2015 in order to prevent him from suffering severe and irreparable harm from the loss of regular season games due to his unlawful suspension.

## GROUNDS TO SET ASIDE THE AWARD

**I.     THE AWARD VIOLATES THE ESSENCE OF THE CBA AS SET FORTH IN THE LAW OF THE SHOP REQUIREMENT OF NOTICE**

98.     In affirming Brady's discipline, the Award disregards the CBA law of the shop requirement that players receive notice of potential discipline for the following separate and independent reasons.

### A.     Brady Had No Notice That a Player Could Be Disciplined for Mere "General Awareness" of Another Person's Conduct

99.     As Vincent's discipline letter states, Brady was suspended for being "generally aware of the actions of the Patriots employees involved in the deflation of the footballs"—not for any alleged ball deflation committed or directed or even authorized by Brady himself. NFLPA Ex. 10; NFLPA Ex. 7, Wells Report at 2 ("Brady . . . was at least generally aware of the inappropriate activities of McNally and Jastremski.").

100.    Yet no NFL policy or precedent notifies players that they might be disciplined for general awareness of misconduct by other people. For example, no player

in NFL history has ever been suspended for being "generally aware" that another player was taking steroids or committing any other type of policy violation.

101.   Rather, recent precedent confirms that the NFL has historically *refrained* from disciplining players for being "generally aware" of alleged conduct detrimental by others.   For example, in the New Orleans Saints *Bounty* case, Goodell did not discipline the entire Saints defense where they would all have been "generally aware" of the alleged "bounty" program.   Instead, Goodell only imposed discipline on four Saints defenders based on their specifically alleged ***participation*** in the program—and even those suspensions were subsequently vacated by Commissioner Tagliabue because of, among other things, lack of adequate notice. NFLPA Ex. 113, *Bounty*, slip op. at 3, 6, 13-15, 18.

102.   Similarly, in the Richie Incognito bullying investigation conducted by Wells and Paul, Weiss, Wells concluded that several members of the Miami Dolphins' offensive line were generally aware of Incognito's bullying of teammate Jonathan Martin—conduct held detrimental to the League.[5] Yet, consistent with every situation in NFL history other than Brady's, none of these other players were disciplined for "general awareness" of Incognito's alleged misconduct.

---

[5] *See* NFLPA Ex. 206, Miami Dolphins Investigative Report at 3 ("Martin was indeed harassed by Incognito, who can fairly be described as the main instigator, and by Jerry and Pouncey, who tended to follow Incognito's lead."); *id.* at 32 ("A few offensive linemen, however, said that Martin was bothered, especially by the taunts about his sister."); *id.* at 72-73 ("One player, whom we found credible, said that Incognito and others routinely mocked Martin's sister and described the taunting as 'an everyday constant thing.'").

103. Even the NFL's Game and Field Equipment Policy ("Equipment Policy")—which is incorporated into the NFL's Policy Manual for Member Clubs-Game Operations ("Game Operations Manual") and is not provided to, nor applicable to, players—sets forth the standard for imposing discipline for ball tampering and makes clear that a player cannot be disciplined for general awareness of an infraction.

104. The application to Brady of an unprecedented "general awareness" disciplinary standard—pulled from whole cloth without warning—warrants vacating the Award.

**B.     Under the Collectively Bargained Player Policies, Brady Had Notice Only of Fines—Not Suspensions—For Equipment Violations Designed to Gain a Competitive Advantage**

105. As the Award concedes, "no player may have been suspended before for tampering with game footballs." NFLPA Ex. 210, Award at 14.

106. This is because the Player Policies actually given out and made applicable to players provide only for specified, collectively bargained *fines* for equipment violations, including those aimed at obtaining a competitive advantage. For example, the Player Policies provide that "[a] player may not use unauthorized foreign substances (*e.g.*, stickum or slippery compounds) on his body or uniform . . . [and that] such a violation affects the integrity of the competition and can give a team an unfair advantage . . . ." NFLPA Ex. 114 at 15. First-time offenders of this player rule, however, are only subject to a fine of $8,268. *Id.* at 20. The Player Policies also contain a "catchall" provision for "Other Uniform/Equipment Violations." *Id.* at 15. First-time player

offenders of this provision are only subject to a fine of $5,512. *Id.* at 20. There is no separate category of violation specified for ball deflation in these policies.

107. These Players Policies, with their collectively bargained fines, do not provide for any suspensions despite the fact that violations of these Policies can be "conduct detrimental" to the integrity of the game.

108. Vincent apparently chose not to apply the Player Policies to Brady because a fine would not have quenched other NFL owners' thirst for a more draconian penalty. But the NFL was not at liberty to disregard the specified and collectively bargained penalties in the Player Policies for which players have notice. No other penalty or policy applicable to players for equipment violations involving competitive advantage was ever provided to Brady or any other player.

**C.** **Brady Had No Notice of the Policy Under Which He *Was* Disciplined**

109. Instead of applying the Player Policies, Vincent punished Brady pursuant to, and for being generally aware of, violations of the Competitive Integrity Policy, which like the Equipment Policy—is only incorporated into the Game Operations Manual and provided only to teams and team executives. Indeed, the Award specifically acknowledges that this Policy "imposes certification and reporting requirements on *clubs and senior club executives*." Award at 17 n.19.

110. Accordingly, Brady testified that he has no recollection of ever seeing or receiving the Competitive Integrity Policy. *Id.* 98:8-99:15 (Brady). And, although the Wells Report states on its face that the investigation was conducted pursuant to the Competitive Integrity Policy (NFLPA Ex. 7, Wells Report at 1), there is no evidence that

Wells bothered to investigated whether the Competitive Integrity Policy was given to players.

111.   Because the Competitive Integrity Policy has never been given to players, no player in NFL history has ever been disciplined—or even investigated—for violating this Policy, let alone for being generally aware of someone else's violation of this Policy. Rather, only Clubs and Club personnel have been subject to discipline thereunder.  For example, in 2009, the NFL suspended a member of the New York Jets equipment staff after he "attempted to use unapproved equipment to prep the K[icking] Balls prior to" a Jets game against the New England Patriots.  NFLPA Ex. 209 at 1.  According to the NFL in imposing the discipline, the equipment personnel's "attempt to use unapproved materials to prep the K[icking] Balls could [have] easily be[en] interpreted as an attempt to gain a competitive advantage." *Id.*  However, the Jets' kicker—the *player w*ho could have benefitted from the alleged "attempt to gain a competitive advantage" (*id.*)—was not investigated, let alone disciplined. Hr'g Tr. 250:7-12 (Vincent).  This was perfectly consistent with the Competitive Integrity Policy's application to Clubs, not players, as well as the fact that even if the Jets kicker was "generally aware" of the infraction, general awareness is not a basis for discipline.[6]

112.   The only other two incidents concerning potential ball tampering in recent years similarly resulted in no player investigation or player discipline.  On November 30,

---

[6] The Award states that "[t]here was no evidence of any player involvement" in this situation, NFLPA Ex. 210, Award at 15, but fails to acknowledge that there was also no League investigation of any player involvement.

2014, during a game between the Minnesota Vikings and Carolina Panthers, ball boys were caught on national television using heaters to warm Vikings footballs in sub-zero temperatures, *i.e.*, tampering with the balls. NFLPA Ex. 174. The NFL sent a warning *to the Club* and publicly stated that Clubs "can't do anything with the footballs in terms of any artificial [sic], whether you're heating them up, whether it's a regular game ball or kicking ball, you can't do anything to the football." *Id.* at 1; NFLPA Ex. 175. No Vikings players were either investigated or punished. This too was consistent with the Competitive Integrity Policy's application to Clubs and the lack of any "general awareness" disciplinary standard.[7]

113.    Additionally, on that same day during the 2014 season, Green Bay Packers quarterback Aaron Rodgers stated publicly that he "like[s] to push the limit to how much air we can put in the football, even go over what they allow you to do and see if the officials take air out of it." NFLPA Ex. 177.    Despite this public statement, no investigation or punishment of Rodgers ensued.

114.    Having no response to the defects in notice, Goodell brazenly asserts in his Award that "[t]he [Competitive Integrity] Policy was not the source or the basis for the discipline imposed here." NFLPA Ex. 210, Award at 17 n.19.    That claim is belied by the undisputed arbitration record and is a *post hoc* argument that even the NFL's own

---

[7] Similar to the Jets incident, the Award disingenuously states that "[t]here was no evidence of any intentional attempt to violate or circumvent the rules, no player involvement, and no effort to conceal the ball attendant's conduct." NFLPA Ex. 210, Award at 15. But, again, there was no investigation of player conduct and it is self-evident that the Vikings Quarterback would have been "generally aware" that the balls felt warm despite the frigid cold.

lawyers did not make at the arbitration hearing. More fundamentally, however, it does nothing to justify the lack of notice. Punishing Brady with a four-game suspension pursuant to *no* policy—when the Player Policies cover the very subject of equipment tampering and only provide for a small fine—is exactly the type of lack of notice and bait-and-switch that this Court found to be contrary to the essence of the CBA in *Peterson.*

115.   At bottom, there is not a single NFL Policy or precedent that ever gave Brady any notice that a player could be suspended for any equipment violation, let alone general awareness of such a violation by others.

**D.    Brady Had No Notice That a Player Could Be Suspended for a Failure to Cooperate**

116.   No player suspension in NFL history has been sustained for an alleged failure to cooperate with any NFL investigation. The Award acknowledges this, too. NFLPA Ex. 210, Award at 14. Rather, before Brady, players had been subject only to limited fines for supposed non-cooperation.

117.   For example, Goodell merely fined former NFL quarterback Brett Favre $50,000 after finding that Favre "was not candid in several respects during the [NFL's sexual harassment] investigation." NFLPA Ex. 170, *Favre fined $50,000 for lack of cooperation in investigation.*

118.   Two years later, faced with a public relations disaster in "Bounty-gate," Goodell made an about-face and, for the first time in NFL history, tried to suspend a player for non-cooperation. Specifically, he suspended former New Orleans Saints

player Anthony Hargrove for allegedly obstructing the League's investigation into the

Saints' bounty program.   Former Commissioner Tagliabue, serving as arbitrator,

resoundingly rejected Goodell's overreaching, holding that suspending a player for non-

cooperation defied the CBA requirement of notice of discipline:

> In December 2010, the NFL fined Brett Favre $50,000—but
> did not suspend him—for obstruction of a League sexual
> harassment investigation.   Although not entirely comparable
> to the present matter, this illustrates the NFL's practice of
> fining, not suspending players, for serious violations of this
> type.   *There is no evidence of a record of past suspensions*
> *based purely on obstructing a League investigation.   In my*
> *forty years of association with the NFL, I am aware of many*
> *instances of denials in disciplinary proceedings that proved*
> *to be false, but I cannot recall any suspension for such*
> *fabrication.    There is no evidence of a record of past*
> *suspensions  based  purely  on  obstructing  a  League*
> *investigation.*

NFLPA Ex. 113, *Bounty*, slip op. at 13 (emphasis added).  Perhaps no one has a broader

perspective on the NFL's disciplinary history than Commissioner Tagliabue, and in his

"forty years of association with the NFL," he could not recall *any* suspension based on

non-cooperation or obstruction.  *Id.*

119.   Moreover, although the Competitive Integrity Policy imposes a duty upon

Clubs to cooperate with investigations under that Policy (NFLPA Ex. 115 at A3), as set

forth above, the Policy does not apply to players and makes no reference to suspensions

for Policy violations, let alone for failures to cooperate in investigations under the Policy.

*Id.* at A2.  This lack of notice stands in contrast to the notice players *do* receive that they

might be fined (not suspended) for failing to cooperate with investigations under the NFL

Personal Conduct Policy, which is provided to players as part of the Player Policies. *See* NFLPA Ex. 125, Personal Conduct Policy at 4.

120.   If all of this were not enough, the arbitration record also indisputably establishes that no one—not Wells or anyone else—notified Brady that he could be punished for declining to produce his personal communications on his personal device to the NFL's outside law firm.   This undisputed evidence eviscerates Goodell's futile attempt—in his Award—to distinguish Brady's alleged non-cooperation from that of other players who were merely fined.  The undisputed fact is that Brady had no notice he could be suspended for following his agent-lawyers' advice and not turning over his private communications on his personal phone to the NFL's outside law firm.

121.   Although the absence of notice is dispositive, it bears mention that Brady testified that if anyone had notified him that he could be suspended for failing to turn over his electronic communications, he would have done so notwithstanding his agent-lawyers' advice. *Id.* 86:16-20 (Brady).

122.   The disciplinary consequence of Brady's decision not to produce his personal communications cannot be overstated.   The Award sustains Wells' adverse inference about the underlying conduct, *i.e.*, Brady's purported general awareness of inappropriate conduct by others, based on Brady's failure to produce documents. *Id.* 304:9-305:14.   The upshot—as the Award lays bare—is that the improper adverse inference based upon Brady's purported lack of cooperation infected the entirety of the suspension—yet the CBA requirement of notice precludes *any* suspension on the non-cooperation ground.   Finally, the Award's vitriol over Brady discarding his phone

pursuant to his long-standing practice has no legal significance as the discipline itself was not based on this at all and the Arbitrator's authority, as this Court held in *Peterson*, is only to review the discipline actually imposed. *Peterson*, slip op. at 14-16.

## II. THE AWARD ALSO VIOLATES THE ESSENCE OF THE CBA BECAUSE THE LAW OF THE SHOP REQUIRES FAIR AND CONSISTENT TREATMENT

123. The Wells Report concluded—based on the work of Exponent, the League's scientific and statistical consultants—that the purported "absence of a credible scientific explanation for the Patriots [footballs] halftime measurements tends to support a finding that human intervention may account for the additional loss of pressure exhibited by the Patriots balls." NFLPA Ex. 7, Wells Report at 13. In his Award, Goodell parrots Wells to reach the same exact conclusion. NFLPA Ex. 210, Award at 6.

124. But imposing a four-game suspension and tarnishing the legacy of an iconic NFL player on the basis of concededly unreliable evidence is not "fair and consistent" and therefore contravenes the CBA law of the shop.

125. It is undisputed that, prior to the AFC Championship Game, the League had no collection and testing procedures for assessing changes in football pressure. As a consequence, the officials did not know to—and therefore did not—record critical information such as the temperature of the locker room where the footballs were tested, the specific gauge used to conduct the testing (here, multiple gauges were used with different calibrations), whether each of the balls was wet or dry (and how wet or dry), or the sequence or timing of the measurements (which was critical, as the balls heated up inside the room but were each measured at different times).

126.   Indeed, the NFL announced *three days ago*—long after the conclusion of the AFC Championship Game and the Wells-Pash Investigation—that it is finally implementing procedures for testing the pressure of footballs.[8]   It is hard to imagine a starker concession about the incurable flaws in the NFL's collection of, and study of, data concerning ball deflation at the AFC Championship Game.

127.   Even the pressure at which the Patriots and Colts footballs began the game is not reliably known.  The Wells Report found that although Referee Walt Anderson tested both teams' balls before the game, he failed to record the PSI measurements or which of his two gauges he used to test and set the footballs—a distinction with a significant difference because the gauges measured PSI materially differently.  Drawing conclusions based on the halftime measurements is rendered even less reliable by the fact that Wells and Exponent decided to assume the *opposite* of what Referee Anderson stated was his "best recollection" of which gauge he used, despite accepting at face value everything else that Anderson had told the League's investigators.  *See, e.g.*, NFLPA Ex. 7, Wells Report at 51-52; NFLPA Ex. 8, Exponent Report at 2.

128.   The undisputed reason for this failure to conduct proper ball pressure testing was that, prior to the Wells-Pash Investigation, League officials had no understanding of the Ideal Gas Law and the fact that balls would naturally deflate when taken from a warm, dry locker room to a cold, wet field.  For this reason, the various

---

[8] *See Pereira: NFL informs officials of new procedures for game balls*, FoxSports.com (July 26, 2015), http://www.foxsports.com/nfl/story/deflategate-new-england-patriots-mike-pereira-changes-to-game-balls-072615?vid=492992067892.

factors that impact natural deflation—such as timing and temperature and wetness—were not recorded. *Id.* 288:17-289:16 (Wells).

129.    Dean Snyder, retained by the NFLPA and Brady, testified that when even a few of Exponent's assumptions were replaced with plausible alternatives, the purported evidence of tampering disappears. *See, e.g., id.* 158:11-159:17, 179:15-23, 183:16-23, 194:1-13. There was no basis for anyone to make a reliable conclusion based on the PSI measurements about whether the observed deflation was due to natural causes or tampering. As Dean Snyder testified: "It's important for me as a researcher and evaluator of data when I see alternatives, if the findings change, then the results are not reliable. . . . When I evaluate alternative assumptions, their findings change, so the bottom line is their results are simply not reliable." *Id.* 157:10-158:16.

130.    Even the Wells Report acknowledges that Exponent's work is inherently unreliable: "[W]e are mindful that the analyses performed by our scientific consultants necessarily rely on reasoned assumptions and that varying the applicable assumptions can have a material impact on the ultimate conclusions." NFLPA Ex. 7, Wells Report at 13. Incredibly, Goodell's Award contains no such qualification, failing to recognize the limited probative value of Exponent's work, which even Wells acknowledged. NFLPA Ex. 210, Award at 6-7.

131.    For Goodell to sustain unprecedented discipline on admittedly unreliable conclusions resting on mountains of unsupported assumptions—because the NFL failed to collect or record the necessary data—is not fair or consistent and is thus contrary to the law of the shop. Only when proper procedures for testing are implemented can the

League make fair and consistent disciplinary determinations about the causes of ball deflation.

## III. THE AWARD IS THE PRODUCT OF A FUNDAMENTALLY UNFAIR APPEAL PROCEEDING

### A. Goodell Summarily Denies the "Improper Delegation" Ground for Appeal Without Any Fair Process

132. Under the CBA, the Commissioner has the *exclusive* authority to impose conduct detrimental discipline on NFL players. NFLPA Ex. 107, CBA Art. 46, § 1(a); NFLPA Ex. 108, CBA App. A, ¶ 15. The NFL has zealously guarded this responsibility as the Commissioner's—and the Commissioner's alone—for decades.

133. Recently, however, Goodell publicly stated his desire to abdicate his disciplinary role and "allow a new individual to make the initial [Article 46] disciplinary decision."[9] That is exactly what Goodell did here. As Vincent's letter disciplining Brady makes crystal clear, Goodell delegated to Vincent his exclusive CBA authority to impose conduct detrimental discipline on Brady. NFLPA Ex. 10.

134. The CBA does not allow this. In fact, the NFLPA brought a CBA grievance against the NFL, challenging the Commissioner's unilateral decision to delegate away his conduct detrimental powers. This grievance is pending, and the *merits* of any Commissioner delegation are not before this Court. However, the Commissioner's

---

[9] *See, e.g. See, e.g., NFL Commissioner Roger Goodell & EVP Jeff Pash League Meeting Press Conference – December 10, 2014*, NFL.com (Dec. 10, 2014), http://nflcommunications.com/2014/12/10/nfl-commissioner-roger-goodell-evp-jeff-pash-league-meeting-press-conference-december-10-2014/.

failure to provide for fair *procedures* for adjudicating the delegation issue *is* appropriate for judicial review here as it requires that the Award be vacated.

135.   Improper delegation was the first ground identified in Brady's disciplinary appeal. NFLPA Ex. 11 at 1; NFLPA Ex. 157 at 2-5. Goodell rejected it out of hand, *before* the arbitration, with *no* evidentiary record, denying the NFLPA and Brady the opportunity to try to develop a record through document discovery and witness examination. *See* NFLPA Ex. 160; NFLPA Ex. 208, June 22 Goodell Order on Discovery and Hearing Witnesses ("June 22 Order").

136.   In doing so, the Commissioner not only unfairly denied Brady the ability to present an issue central to his appeal, Goodell simply declared as gospel his own version of the "facts." Specifically, the Commissioner proclaimed that he "I did not delegate my authority as Commissioner to determine conduct detrimental discipline." Award at 18 (recounting prior decision). He then repeats his own factual proffer in the Award as a basis for upholding the discipline. NFLPA Ex. 210, Award at 18-19. But the purpose of the arbitration was for the NFLPA and Brady to *challenge* the League's version of the facts—not for the Commissioner (the arbitrator) simply to assume his own conclusion.

137.   Following the denial of their Recusal Motion, the NFLPA and Brady moved to compel the testimony of Goodell and Vincent in order to develop a factual record for Brady's improper delegation ground for appeal. NFLPA Ex. 166 at 2-4. Goodell denied this motion too, stating that he had already decided that there was no improper delegation. NFLPA Ex. 208, June 22 Order.

138.    Not only was this denial of Brady's right to confront witnesses fundamentally unfair, it also contravened established law of the shop precedent that an Article 46 hearing officer has the duty to compel the testimony of relevant NFL witnesses.    For example, in *Rice*, Judge Jones compelled Goodell and other NFL executives to testify, so that the player and the Union could ask about their roles in the discipline. *See, e.g.*, NFLPA Ex. 166E, *Rice* Order on Discovery and Hearing Witnesses at 2 ("*Rice* Discovery Order").    And, in *Bounty*, former Commissioner Tagliabue—serving as arbitrator—compelled numerous League and Club personnel to testify (including Vincent) so that the NFLPA and the four appellant Saints players would have the ability to develop the arbitration record and to confront their accusers.    NFLPA Ex. 166F, *Bounty* Pre-Hr'g Conference Tr. 220:14-221:3; NFLPA Ex. 166G, *Bounty* Pre-Hr'g Order No. 1.

### B.    Commissioner Goodell Denies the NFLPA and Brady Equal Access to the League's Investigative Files

139.    In both *Bounty* and *Rice*, Article 46 arbitrators compelled the League to produce the investigative files underlying its factual conclusions so that the appellant players would have a fundamentally fair hearing. *See* NFLPA Ex. 166 at 6 (investigative files ordered to be produced in the *Bounty* and *Rice* arbitrations).    This precedent became the law of the shop.

140.    Yet, here, Goodell ignored the precedents set by Judge Jones and former Commissioner Tagliabue and denied the Union's motion to compel production of the investigative files. *Id.* at 5-6; *see also* NFLPA Ex. 159 at 2-3.

141.   Although the NFL took the position that the Paul, Weiss interview notes played no role in the disciplinary decisions, it was precisely because the Wells Report's conclusions formed the basis for the discipline that it was critical for Brady to have access to the investigative files in order to challenge the underlying facts.

142.   Compounding the fundamental unfairness was the fact that Paul, Weiss— which acted as defense counsel for the NFL at the arbitration—*did* have access to the investigative files.  Indeed, Paul, Weiss partner Lorin Reisner—who conducted most of the witness examinations at the hearing, including Brady's—was the co-lead partner in the investigation with Wells, and he, and his team, sat at counsel table for the NFL during the arbitration and were able to utilize the very information denied to Brady.  This was a clear violation of Brady's right to a fundamentally fair hearing.  The Award makes no mention of the issue at all.

### C.   Commissioner Goodell Refused to Compel the Testimony of Co-Lead Investigator Jeff Pash

143.   Judge Jones and Commissioner Tagliabue also set CBA precedents conclusively establishing that players have a fundamental procedural right, in Article 46 appeal arbitrations, to confront the investigators whose work forms the basis for discipline.  *See, e.g.*, NFLPA Ex. 166D, *Bounty* Pre-Hr'g Order No. 4; *cf.* NFLPA Ex. 166E, *Rice* Discovery & Witnesses Order at 2.

144.   The NFL publicly declared that NFL Executive Vice President and General Counsel Jeff Pash was the co-lead investigator on the Wells-Pash Investigation.  NFLPA

Ex. 181 (NFL Press Release stating: "The investigation is being led jointly by NFL Executive Vice President Jeff Pash and Ted Wells . . . .").

145.    Accordingly, the NFLPA and Brady moved to compel the testimony of co-lead investigators Wells and Pash at Brady's appeal hearing (the NFL refused to voluntarily make either witness available). NFLPA Ex. 166 at 5-6. Although Goodell granted the NFLPA's motion to compel the testimony of Wells, NFLPA Ex. 208, June 22 Order at 2, the Commissioner denied the motion as to Pash, claiming that he did not play a substantive role in the investigation." Award at 19 n.21.

146.    As the Award acknowledges, however, Wells testified that Pash reviewed a draft of the Wells Report and provided Paul, Weiss with comments prior to the Report's public release. Hr'g Tr. 268:17-25. Given the NFL's claim that the Wells Report findings were "independent," and that Pash played no substantive role in the investigation, it was fundamentally unfair to deny Brady the opportunity to confront Pash about his changes to the Wells Report and his overall involvement as co-lead investigator.

147.    If Pash truly had no substantive role, then he simply could have so testified. Of course, such testimony would beg the question of why the NFL's General Counsel would then be editing a supposedly independent investigative report. Cognizant of this

dilemma, Goodell simply precluded the NFLPA and Brady from asking Pash any questions at the arbitration.[10]

148.    The combination of all the actions set forth above rendered Brady's appeal hearing a kangaroo court proceeding, bereft of fundamentally fair procedures, requiring that the Award be set aside.

## IV.    COMMISSIONER GOODELL WAS EVIDENTLY PARTIAL

149.    Neither the CBA nor the LMRA sanctions arbitration awards issued by evidently partial arbitrators.

150.    Here, as described above, a central ground of Brady's appeal was the issue of Goodell improperly delegating to Vincent his exclusive authority to discipline players for conduct detrimental to the NFL.    Goodell and Vincent were thus essential fact witnesses at the arbitration, and any arbitrator hearing Brady's appeal would have to consider the facts and adjudicate the legality of the Commissioner's delegation.

151.    It is hard to imagine any person in Goodell's position even attempting to serve as arbitrator under these circumstances, but that is exactly what he did.   He denied the NFLPA's Recusal Motion and simultaneously (and summarily) rejected the delegation argument—trying to pave his own path to stay on as arbitrator of Brady's

---

[10] The Award states that the NFLPA has waived this argument by not seeking at the hearing "*re*consideration of [Goodell's] decision denying [the NFLPA's] motion to compel Mr. Pash's testimony." NFLPA Ex. 210, Award at 19 n.21. This is ridiculous. The NFLPA preserved the argument by making a formal motion to compel Pash's testimony which Goodell denied because of Pash's purported lack of any "significant" role—a finding undermined by Wells' testimony. *Id.*

appeal.  This conduct shows not merely evident partiality but actual bias, rendering

Goodell unfit to serve as arbitrator under any standard.

152.  Further, prior to serving as hearing officer, the Commissioner publicly

lauded the reliability of the Wells Report—the issue at the very heart of Brady's appeal:

> I want to express my appreciation to Ted Wells and his
> colleagues for performing a thorough and independent
> investigation, the findings and conclusions of which are set
> forth in today's comprehensive report.

NFLPA Ex. 157 at 7 (citation omitted).  Goodell's choice to make these public comments

locked him into supporting the Wells Report and rendered him incapable of reaching a

contrary conclusion in Brady's appeal, as doing so would undermine his own competency

as Commissioner.  The Award itself proves this point—it is just a recycling of the

conclusions of the Wells Report as though the arbitration hearing never happened.

153.  Applicable labor law and arbitral standards simply do not permit an

arbitrator to publicly comment on the very subject matter he has been called upon to

arbitrate and to then continue to serve as arbitrator.

154.  Sports League Commissioners are not somehow above this standard.  The

case law is well-established that even when a League Commissioner has specifically been

delegated to serve as arbitrator of parties' disputes, the Commissioner may not arbitrate a

particular dispute in which his own conduct and actions are called into question.  *See*

*Morris*, 575 N.Y.S.2d at 1016-17 (removing NFL Commissioner as arbitrator because of

his "evident partiality and bias . . . with respect to this specific matter"); *Erving v.*

*Virginia Squires Basketball Club*, 349 F. Supp. 716, 719 (E.D.N.Y. 1972) (disqualifying

Commissioner from sitting as arbitrator due to facts of specific dispute), *aff'd*, 468 F.2d 1064 (2d Cir. 1972); *see also State ex rel. Hewitt v. Kerr*, No. SC 93846, 2015 WL 2061986, at *10 (Mo. Apr. 28, 2015) (en banc) (examining facts of case and determining that Commissioner's "position of bias" required court to remove him as arbitrator). These courts analyzed the Commissioner's fitness to serve as arbitrator in the specific facts of these cases and found him impermissibly evidently partial in each one despite being designated arbitrator in the relevant arbitration provisions. The same result is warranted here.

## PRAYER FOR RELIEF

## VACATUR OF ARBITRATION AWARD

155.   The NFLPA and Brady repeat and re-allege Paragraphs 1-154 as if set forth fully herein.

156.   The NFLPA and Brady petition to vacate Goodell's Award.

157.   The Award must be vacated because it fails to draw its essence from the parties' CBA:

    a.    Commissioner Goodell, serving as arbitrator, disregarded the law of the shop and this Court's binding ruling in *Peterson* that the CBA requires that NFL players have advance notice of potential discipline, and

    b.    Commissioner Goodell, serving as arbitrator, disregarded the law of the shop that conduct detrimental discipline be fair and consistent.

158.   The Award must also be vacated because Commissioner Goodell denied Brady access to evidence and witnesses central to his appeal, and otherwise deprived Brady of his right to a fundamentally fair hearing.

159.   Finally, the Award must be set aside for the independent reason that the circumstances of Brady's discipline and appeal rendered Commissioner Goodell an evidently partial arbitrator and the NFLPA did not agree that Goodell could serve as arbitrator under such circumstances.

160.   WHEREFORE, in light of the foregoing, and in accordance with Section 301 of the LMRA and Section 10 of the FAA, the NFLPA and Brady respectfully request that the Court vacate the Award.

Dated: July 29, 2015                Respectfully Submitted,

                                    By: s/ Barbara Podlucky Berens

                                    BERENS & MILLER, P.A.
                                       Barbara Podlucky Berens, #209788
                                       3720 IDS Center
                                       80 South Eighth Street
                                       Minneapolis, MN 55402
                                       Tel: 612-349-6171
                                       bberens@berensmiller.com

                                    WINSTON & STRAWN LLP
                                       Jeffrey L. Kessler (*pro hac vice pending*)
                                       David L. Greenspan (*pro hac vice pending*)
                                       Benjamin Sokoly
                                       Jonathan J. Amoona
                                       200 Park Ave.
                                       New York, NY 10166
                                       Tel: 212-294-6700
                                       Fax: 212-294-4700
                                       jkessler@winston.com
                                       dgreenspan@winston.com

bsokoly@winston.com
jamoona@winston.com

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION
DeMaurice F. Smith (*pro hac vice pending*)
1133 20th Street, N.W.
Washington, DC 20036
Tel:  202-756-9136
demaurice.smith@nflplayers.com

*Attorneys for the NFLPA and Brady*

GIBSON, DUNN & CRUTCHER LLP
Andrew S. Tulumello (*pro hac vice pending*)
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Tel: 202-955-8657
Fax: 202-530-9678
atulumello@gibsondunn.com

*Attorneys for Brady*